**Opinion issued July 23, 2015**



In The

# Court of Appeals

For The

## First District of Texas

———————————

**NO. 01-15-00160-CV**

———————————

## IN THE INTEREST OF D.L.D., JR., L.L.S., J.J.S., AND H.N.S.,
## MINOR CHILDREN

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2013-05778J**

---

## MEMORANDUM OPINION

Following a bench trial, the trial court signed a judgment terminating the

parent–child relationship between J.T.D. ("Mother") and her four minor children:

D.L.D., L.L.S., J.J.S. and H.N.S.[1]  On appeal, Mother presents two issues.  She claims that the evidence was not legally or factually sufficient to support the trial court's judgment, and she alleges that the trial court engaged in misconduct during trial.

We affirm.

## Background

On October 18, 2013, the Department of Family and Protective Services ("the Department") filed suit in Montgomery County, requesting the trial court to issue temporary orders appointing the Department the temporary sole managing conservator of D.L.D., L.L.S., J.J.S. and H.N.S.  If family reunification could not be achieved, the Department sought to terminate Mother's parental rights to her children.  The Department offered the affidavit of its authorized representative, Amy Loggins, to support its petition.

In her affidavit, Loggins stated that, on July 4, 2013, the Department received a report of "neglectful supervision" by Mother of four-year-old D.L.D. Mother and her four children, ranging in age from one year to five years old, were living in the Montgomery County Women's Shelter.  The report alleged that D.L.D. was being "touched inappropriately" by his cousin.  The report also alleged

---

[1]     The judgment also terminated the parent–child relationship between L.L.S., J.J.S. and H.N.S. and their respective fathers.  However, the fathers do not appeal the judgment.

that Mother was aware of the touching, but had "failed to make adequate efforts to ensure D.L.D.'s safety."

On July 5, 2013, Loggins went to the shelter to investigate and spoke with Mother. Mother told Loggins that her children were not subject to sexual abuse and were adequately supervised. Loggins learned that Mother had come to live at the shelter after Mother and Mother's sister were "kicked out" of another shelter for fighting.

Loggins learned that each child had a different father. Mother did not know how to locate any of the fathers but stated that "they live somewhere in Louisiana."

Loggins also spoke to D.L.D. Loggins stated that D.L.D. made no outcry of sexual abuse to her, and Loggins observed that D.L.D. had no unusual marks or bruises. Loggins also did not observe any marks or bruises on the three younger children.

Loggins indicated in the affidavit that the Department had received a second report of "neglectful supervision" on July 13, 2013, regarding all four children. The report stated that "the children were accessible to their aunt, who place[s] the children at substantial risk of harm due to inadequate supervision and sexual abuse." The report also stated that Mother allowed the aunt to have access to the children "despite concerns related to sexual abuse."

Loggins further stated in the affidavit that, on July 17, 2013, she received a telephone call from a staff member at the women's shelter where Mother and the children were staying. The staff person informed Loggins that Mother "would be asked to leave the shelter today for having too many violations while living at the shelter." The staff person stated that she "would not have a place for [Mother] and her four children to live."

That same day, Loggins went to the shelter and spoke with Mother, who stated that she was being "forced out of the shelter and she did not know where she would live." Mother told Loggins that she did not have an alternative placement for the children. Loggins concluded the affidavit by stating the Department sought to be named the children's temporary managing conservator because Mother was unable to "to provide a stable home and [an] appropriate caregiver for her children."

The Department was appointed temporary managing conservator of the children, and the children were placed in foster care. In August 2013, Mother signed and agreed to follow a family service plan. The family service plan indicated that Mother was not able to provide her four children with a safe and stable environment. She and the children had been living in homeless shelters; however, the family had been evicted from two shelters because Mother violated the shelters' rules by fighting with her sister, who also lived at the shelters. Mother

4

had been both "a victim and perpetrator of domestic violence with her sister." The plan stated that Mother's four children "are exposed to family arguments, bullying, name calling, and physical fights." The service plan further stated, "While the sisters have remained together, their relationship has become one of bickering and violence toward one another. Their children have become the center of this verbal and physical lifestyle. It is difficult to protect children when the lifestyle involves violence and issues of insecurity and indecision."

The service plan also indicated that "[t]wo of the children have medical needs that have not been resolved, each of which will involve a form of surgery." The youngest child, H.N.S., required leg braces, but Mother had stated that "she did not go back to the doctor to get [the braces]."

The plan set out several tasks and services for Mother to complete before she would be reunited with her children. The service plan required Mother to complete the following tasks and services: (1) participate in parenting classes; (2) attend weekly therapy; (3) maintain contact with her children "on a regular basis to promote/maintain bonding and attachment"; (4) develop a support system of family and friends and "to utilize community available resources to benefit her family"; (5) submit to random drug screenings "to ensure that she is maintaining a drug-free lifestyle"; (6) submit to psychological testing; (7) refrain from engaging in illegal activities; (8) contact the caseworker on a monthly basis; (9) maintain

5

safe housing; (10) stop associating or communicating with people engaging in self-destructive behaviors; and (11) maintain stable employment and provide her caseworker with bi-weekly income statements.

The family service plan warned Mother as follows:

> This is a very important document. Its purpose is to help you provide your child with a safe environment within the reasonable period specified in the plan. If you are unwilling or unable to provide your child with a safe environment, your parental and custodial duties and rights may be restricted or terminated or your child may not be returned to you. There will be a court hearing at which a judge will review this service plan.

The trial court conducted a status hearing on September 11, 2013. Mother and her court-appointed counsel attended the hearing. The trial court signed an order, approving the family service plan. The order stated that Mother had reviewed the service plan and had signed it.

Mother moved to Harris County, and the case was transferred to that county in October 2013. During the pendency of the case, the trial court held permanency hearings and signed orders that also approved the service plan.

The case was tried to the bench, beginning on November 11, 2014. D.L.D.'s father testified on that date, but then trial was recessed for two months. Trial resumed and concluded on January 20, 2015.

At trial, the Department presented evidence showing that, while the case was pending, Mother failed to obtain housing or employment, tested for cocaine, failed

to undergo all scheduled drug screenings, was convicted of the offense of prostitution, did not attend all scheduled visits with her children, and failed to keep in contact with the Department's caseworker. The evidence also showed that the oldest child, D.L.D., had been living with his father since July 2014. D.L.D. was doing well in his father's care. The evidence further showed that the three younger children were also progressing and doing well in their foster placement.

After the trial concluded, the trial court rendered judgment terminating the parent–child relationship between Mother and her four children. The trial court found that clear and convincing evidence showed (1) Mother had knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being; (2) Mother had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being; (3) Mother had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children; and (4) termination of her parental rights was in the children's best interest.[2] The trial court appointed the

---

[2] *See* Act of May 19, 1997, 75th Leg., R.S., ch. 575, § 9, sec. 161.001(1)(D),(E),(O), (2), 1997 Gen. Tex. Laws 2012, 2015, *amended by* Act of Mar. 30, 2015, 84th Leg., R.S., S.B. 219, art. 1, § 1.078, sec. 161.001(b)(1)(D),(E),(O), (b)(2) (West, Westlaw through 2015 R. Sess.). We note that the recent amendment to section 161.001 does not affect the resolution of Mother's appeal; however, the subsections have been renumbered.

Department as the sole managing conservator of the three youngest children. D.L.D.'s father was named his sole managing conservator.

This appeal followed. Mother now raises two issues.

## Sufficiency of the Evidence

In her second issue, Mother asserts that the evidence was legally and factually insufficient to support the trial court's finding that termination of the parent–child relationship was in the children's best interest. Mother does not challenge the other findings of the trial court.

## A. Standard of Review

Termination of parental rights requires proof by clear and convincing evidence. Act of May 19, 1997, 75th Leg., R.S., ch. 575, § 9, sec. 161.001(1), 1997 Gen. Tex. Laws 2012, 2015 (amended 2015); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). This heightened standard of review is mandated not only by the Family Code but also by the Due Process Clause of the United States Constitution. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *see also Santosky v. Kramer*, 455 U.S. 745, 753–54, 102 S. Ct. 1388, 1394–95 (1982) (recognizing fundamental liberty interest parent has in his or her child and concluding that state must provide parent with fundamentally fair procedures, including clear and convincing evidentiary standard, when seeking to terminate parental rights). The Family Code defines clear and convincing evidence as "the measure or degree of proof that will

produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2014); *J.F.C.*, 96 S.W.3d at 264. Here, the Department was required to establish, by clear and convincing evidence, that Mother's actions satisfied one of the grounds listed in former Family Code section 161.001(1) and that termination was in the children's best interest. *See* Act of May 19, 1997, 75th Leg., R.S., ch. 575, § 9, sec. 161.001(1), (2), 1997 Gen. Tex. Laws 2012, 2015 (amended 2015).

When determining legal sufficiency, we review all the evidence in the light most favorable to the finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *J.F.C.*, 96 S.W.3d at 266. To give appropriate deference to the fact finder's conclusions, we must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id*. We disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible. *Id.* This does not mean that we must disregard all evidence that does not support the finding. *Id.* The disregard of undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* Therefore, in conducting a legal-sufficiency review in a parental-termination case, we must consider all of the evidence, not only that which favors the verdict. *See City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005).

9

In determining a factual-sufficiency point, the higher burden of proof in termination cases also alters the appellate standard of review. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* at 25. In considering whether evidence rises to the level of being clear and convincing, we must consider whether the evidence is sufficient to reasonably form in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established. *Id.* We consider whether disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

We are mindful that the natural rights that exist between parents and their children are of constitutional dimension. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.

10

1985).  Therefore, termination proceedings should be strictly scrutinized, and the involuntary termination statutes should be strictly construed in favor of the parent. *Id.* at 20–21; *see also In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012).  However, "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent–child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."  *C.H.*, 89 S.W.3d at 26; *see also In re E.C.R.*, 402 S.W.3d 239, 240 (Tex. 2013).

## B.     Best Interest of the Children

### 1.     *Applicable Legal Principles*

There is a strong presumption that the best interest of the child will be served by preserving the parent–child relationship.  *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.  TEX. FAM. CODE ANN. § 263.307(a) (West, Westlaw through 2015 R. Sess.).[3]  Among others, the following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home

---

[3]     The Texas Legislature recently amended Family Code section 263.307.  *See* Act of Mar. 30, 2015, 84th Leg., R.S., S.B. 219, art. 1, § 1.181, sec. 263.307 (West, Westlaw through 2015 R. Sess.).  However, the revisions to the statute were minor and did not change the statutory language cited herein.  Nor did the amendment affect the numbering of the statutory provisions.  Thus, we cite to the current version of the statute.

placements; (3) the magnitude, frequency, and circumstances of harm to the child; (4) whether there is a history of substance abuse by the child's family or others that have access to the child's home; (5) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (6) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (7) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with minimally adequate health and nutritional care, guidance and supervision, and a safe physical home environment; and (8) whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

The Supreme Court of Texas has set out some additional factors that courts may consider when determining the best interest of the child, including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent

that may indicate that the existing parent–child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This is not an exhaustive list, and a court need not have evidence on every element listed in order to make a valid finding as to the child's best interest. *C.H.*, 89 S.W.3d at 27. While no one factor is controlling, analysis of a single factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the child. *See In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).

The evidence supporting the statutory grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent–child relationship. *C.H.*, 89 S.W.3d at 28; *In re H.D.*, No. 01–12–00007–CV, 2013 WL 1928799, at *13 (Tex. App.—Houston [1st Dist.] May 9, 2013, no pet.). Furthermore, in conducting the best-interest analysis, a court may consider not only direct evidence but also may consider circumstantial evidence, subjective factors, and the totality of the evidence. *See H.D.*, 2013 WL 1928799, at *13.

### 2. Analysis

At trial, the Department presented evidence showing that Mother had been unable to provide her children with a stable home in the past and was still unable to do so at the time of trial. The family service plan, admitted into evidence,

indicated that Mother and her four children were evicted from the women's shelter in July 2013 because Mother and her sister had been fighting. Prior to that, she and her children had been evicted from another shelter because Mother and her sister had been fighting. At trial, Mother acknowledged that she had been evicted from the last shelter for arguing with her sister.

The evidence showed that, during the 18 months the case was pending, Mother still had not found housing. The Department's caseworker, John Gregory, testified at trial on January 20, 2015. He stated that Mother had not provided him with the address where she was living, although required to do so by the service plan. Instead, she had told him two or three times that she was living with "a friend." Gregory also testified that, starting in October 2014 when he was assigned to the case, he had given information to Mother regarding how to obtain housing. He stated that he had provided Mother with the contact information for HUD and had instructed her to get on the waiting list for housing. Mother had never provided proof to Gregory showing that she had contacted HUD or found housing.

At trial, Mother agreed that she did not have a safe and stable place to live. However, she testified that she had applied with HUD on January 6, only two weeks before trial, to be placed on a waiting list for housing. She acknowledged that, at that time, her children had already been in foster care for over one year.

14

Gregory testified that Mother also had not demonstrated that she had been seeking employment. Gregory stated that Mother told him that she would not apply for a job at a fast food restaurant because she needed a better income to support her four children. Gregory testified that he had informed Mother that she needed to make an effort to find work to demonstrate to the court that she was attempting to find employment. Seeking employment was also a requirement of the service plan. Gregory testified that he had provided Mother with resources to find a job; however, she had not taken advantage of these resources.

At trial, Mother testified that it was difficult for her to find a job because she has dyslexia. *See Holley*, 544 S.W.2d at 371–72 (listing as best–interest factor: any excuse for the acts or omissions of the parent). She also testified that she was self-employed. Mother stated that she was in "sewing school" and was working to create a website to start her own business. Mother stated that she was working to get her business "off the ground" but did not know how long that would take.

In short, the evidence showed that Mother had not provided proof to the Department that she had sought housing or employment during the 18 months the case had been pending, despite the fact that the Department had provided her with job and housing resources. *In re J.M.*, No. 01–14–00826–CV, 2015 WL 1020316, at *7 (Tex. App.—Houston [1st Dist.] Mar. 5, 2015, no pet.) (mem. op.) (stating courts may consider the willingness and ability of the child's family to effect

15

positive environmental and personal changes within a reasonable period of time). "A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs." *In re J.R.W.*, No. 14–12–00850–CV, 2013 WL 507325, at *9 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.). We conclude that the evidence regarding Mother's housing instability and lack of employment is supportive of termination under the following *Holley* factors: the emotional and physical needs of the children now and in the future; the emotional and physical danger to the children now and in the future; the plans for the children by these individuals or by the agency seeking custody; and the stability of the home or proposed placement. *See Holley*, 544 S.W.2d at 371–72.

In addition, Gregory testified that Mother had "completed parenting classes, a psychiatric evaluation, a psychological evaluation, and five sessions of individual counseling"; but, she had failed to complete the other court-ordered tasks required in the service plan. Mother testified that she was unable to complete all of the required services because she did not have money for transportation. *See id.* (listing as best–interest factor: any excuse for the acts or omissions of the parent). Nonetheless, a factfinder may infer from a parent's failure to take the initiative to complete the services required to regain possession of her children that she does not have the ability to motivate herself to seek out available resources needed now or in the future. *See J.M.*, 2015 WL 1020316, at *7; *see also* TEX. FAM. CODE

16

ANN. § 263.307(b)(10) (providing that courts may consider the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision); *Holley*, 544 S.W.2d at 371–72 (listing as factor: parental abilities of individual seeking custody and programs available to assist these individuals to promote best interest of child as factors to consider).

The evidence further showed that Mother has a history of illegal drug use. During the pendency of the case, in September 2014, Mother tested positive for cocaine. Mother also failed to participate in other required drug testing requested by the Department. Parental drug abuse reflects poor judgment and may be a factor to be considered in determining a child's best interest. *See* TEX. FAM. CODE ANN. § 263.307(b)(8) (providing that courts may consider whether there is history of substance abuse by child's family). A parent's exercise of poor judgment currently and in the past demonstrates an inability to provide adequate care for a child. *See J.M.*, 2015 WL 1020316, at \*7. Parental drug use has been found to be a condition indicating instability in the home environment. *Id.*; *see also In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with his family service plan support a finding that termination is in the best interest of the child.").

The evidence also showed that Mother had pleaded guilty to the offense of prostitution in November 2014, two months before trial concluded. Like drug use, engaging in criminal conduct is indicative of poor parental judgment and instability. Drug abuse and prostitution places the safety and stability of the children at risk. *See In re M.C.H.*, No. 14–12–00103–CV, 2012 WL 1795123, at *4 (Tex. App.—Houston [14th Dist.] May 17, 2012, no pet.) (mem. op.).

Relevant to her parenting abilities, Mother admitted to missing scheduled visits with her children. Caseworker Gregory also gave the following testimony regarding what he observed during one of Mother's visits with her children:

> [Mother] wanted to take a picture of the children and she had them jump up and down and she made the statement I want them to do something really retarded so I can take a picture. And also at that visit, at the very beginning of the visitation, [D.L.D.] had called his mom by first name and not by mom. And I had to step in in order to correct him when it should be mom that had corrected him and that showed a lack of bondage between them.

*See Holley*, 544 S.W.2d at 371–72 (identifying as factor: parental abilities of individual seeking custody and acts or omissions of the parent that may indicate that existing parent–child relationship is not a proper one).

At the time of trial, the oldest child, D.L.D., was seven years old. The three younger children, L.L.S., J.J.S. and H.N.S., were four, three and two years old, respectively. No evidence was presented regarding the desires of the children, other than Gregory's testimony indicating that D.L.D. was happy living with his

18

father. *See id.* (identifying desire of the child as best-interest factor). D.L.D.'s father testified that D.L.D. had been living with him in Louisiana since July 2014. He stated that D.L.D. seldom asked about Mother.

Testimony revealed that all four children were doing much better at the time of trial than they had been doing when removed from Mother's care in July 2013. The evidence showed that, when removed from Mother's care, D.L.D. was not potty-trained, even though he was five years old. Caseworker Gregory testified that seven-year-old D.L.D. was doing well in his father's care. *See id.* (listing as best-interest factors: parental abilities of individual seeking custody; plans for child by these individuals or by agency seeking custody; and stability of the home or proposed placement). The evidence showed that D.L.D. had become potty-trained. The evidence further showed that D.L.D. was developmentally on target and was doing well in school.

The evidence also showed that, in the past, D.L.D. had been taking psychotropic medication for ADHD and phobias, and he had suffered from hallucinations. The evidence at trial showed that D.L.D. had been taken off the psychotropic medication by his doctor. The only medication that D.L.D. continued to need was allergy medicine. *See id.* (identifying emotional and physical needs of child now and in future as best-interest factor). The evidence further showed that D.L.D.'s father was employed at Burger King as a manager. D.L.D.'s father

testified that he would ensure that D.L.D. maintained a relationship with his three younger siblings by bringing D.L.D. to visit them in Texas.

The evidence further showed that the three younger children, L.L.S., J.J.S. and H.N.S., were placed together in a foster home one month before trial. Testimony was presented that the foster family wished to adopt the three children and that the children had already bonded with the foster family. The evidence showed that the children's communication skills had improved since living with the foster family. According to Gregory, the three children had made a "complete turnaround" for the better since being with the foster family.

In addition, the evidence showed L.L.S., J.J.S. and H.N.S. each had special medical needs. L.L.S. has ongoing speech and hearing problems. Gregory testified that L.L.S. needs to be treated by an audiologist. Gregory stated that three-year-old J.J.S. "at the beginning . . . was diagnosed with average functioning and adjustment disorder and he was aggressive." With respect to the youngest child, two-year-old H.N.S, Gregory testified that "she has clubfoot." H.N.S. also has a heart murmur and vision issues. Gregory stated that H.N.S. has been referred to an orthopedic surgeon regarding her foot. She has also been referred to an ophthalmologist and a cardiologist. Gregory indicated that the current foster parents are willing and able to meet the children's medical, physical, and emotional needs. *See id.* (listing as best-interest factors: emotional and physical

20

needs of child now and in the future, and plans for child by these individuals or by agency seeking custody).

In her brief, Mother asserts that the evidence was not sufficient to support the best-interest finding. Mother claims the evidence showed that the Department had "a lack of interest" in reuniting her with her children. She claims that the Department provided her with only "a small amount of help" with respect to facilitating her completion of the services required for her to regain custody of her children.

Mother acknowledges that Gregory testified that he had provided her with resources to help her obtain housing and employment. However, she claims that this was only a "minimal" or a "small amount" of help to reunite her with her children. She claims that the Department should have provided her more assistance to complete her services. She intimates that she would have completed all of her services had the Department given her more assistance. Mother points out that evidence was presented that she "lacked the funds to complete and attend" the services.

Relevant to this argument, Gregory explained that the Department does not obtain a job or housing for a parent; rather, the Department provides parents with contacts and resources. He stated that it is the parent's responsibility to find housing and employment using those resources.

21

Gregory testified that, although he provided Mother with job and housing resources, she did not provide any proof that she had made any attempt to find housing or employment using those resources. Mother, however, testified that she had applied for employment at fast food restaurants and that she had contacted the employment resources provided to her by Gregory. Mother also testified that she had contacted HUD regarding housing.

"It is well established that, in a bench trial, the judge as the trier of fact weighs the evidence, assesses the credibility of witnesses and resolves conflicts and inconsistencies." *In re D.D.D.K.*, No. 07–09–0101–CV, 2009 WL 4348760, at *6 (Tex. App.—Amarillo Dec. 1, 2009, no pet.) (mem. op.). Here, the trial court was free to believe Gregory's testimony and disbelieve that of Mother, including her excuses for not completing the services and her claim that she had applied for jobs and for housing. We note that, although Mother claims that the Department should have offered her more assistance, she does not explain what additional assistance could have been made available to her. Moreover, evidence was presented showing that Mother did not take advantage of the resources that were made available to her. The trial court could have reasonably inferred that she would not have utilized any additional resources had they been provided to her.

After viewing all of the evidence in the light most favorable to the best-interest finding, we conclude that the evidence was sufficiently clear and

22

convincing that a reasonable fact finder could have formed a firm belief or conviction that termination of the parent–child relationship between Mother and her children was in the children's best interest. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's finding that termination of the parent–child relationship between Mother and the children was in the children's best interest or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination was in the children's best interest. Therefore, after considering the relevant factors under the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent–child relationship is in the children's best interest.

We overrule Mother's second issue.

## Trial Court Conduct

In her first issue, Mother claims that the trial court engaged in behavior during trial that violated the Texas Code of Judicial Conduct. Specifically, Mother frames her issue as follows: "The trial court abused its discretion when it engaged in conduct that was prejudicial to the business of the courts, undermines public confidence in the judiciary, and creates a strong appearance of impropriety resulting in the termination of Appellant's parental rights."

**A.      Legal Principles**

To reverse a judgment on the ground of judicial misconduct, we must find

judicial impropriety, i.e., error, coupled with probable prejudice to the complaining

party, resulting in the rendition of an improper judgment. *See Tex. Emp'rs Ins.*

*Ass'n. v. Draper*, 658 S.W.2d 202, 209 (Tex. App.—Houston [1st Dist.] 1983, no

writ); *see also* TEX. R. APP. P. 44.1(a); *Silcott v. Oglesby*, 721 S.W.2d 290, 293

(Tex. 1987).   In reviewing a "judicial misconduct" complaint, we examine the

entire record to determine whether the trial court's conduct harmed the appellant.

*Pitt v. Bradford Farms*, 843 S.W.2d 705, 706–07 (Tex. App.—Corpus Christi

1992, no writ).

**B.      Analysis**

Mother first asserts that the trial court failed to abide by Canon 3B(3) of the

Texas Code of Judicial Conduct, which provides: "A judge shall require order and

decorum in proceedings before the judge."   TEX. CODE JUD. CONDUCT, Canon

3B(3), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. B (Vernon 2013).

In support of this assertion, Mother directs us to the following exchange during the

January 2015 cross-examination of D.L.D.'s father, who is a manager at a Burger

King in Louisiana, by the appointed counsel for the unknown father:

> [Unknown father's counsel:]   Have you tried the Texas Double
> Whopper yet?

[Children's Attorney Ad Litem:]  Objection rel—asked and answered actually.

[Unknown father's counsel:]  No.  Not since—November he may have tried it already.[4]  Pass the witness.

THE COURT:  I'm going to leave you—well, no.  You can go.

In her brief, Mother asserts, "This is an example of how the [trial court] lacked the ability to control the courtroom and allow silliness to pervade a very serious proceeding."  We disagree that this exchange demonstrates that the trial court did not require order and decorum during the proceeding.  After the attorney ad litem objected, the unknown father's counsel did not pursue the questioning and passed the witness.  The trial court then released the witness.  The complained-of exchange was isolated and brief.  Because it was self-limiting in duration, the exchange did not require the trial court to intervene or take corrective action.

Mother next claims that the trial court "intentionally disrespected" her in violation of Canon 3B(4), which provides: " A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity, and should require similar conduct of lawyers, and of staff, court officials and others subject to the judge's direction and control."  TEX.

---

[4]    As mentioned, trial began in November 2014 with the testimony of D.L.D.'s father.  Trial was recessed and continued until January 2015 at which time D.L.D.'s father again testified.  The unknown father's attorney had also asked D.L.D.'s father whether he had tried the Texas Double Whopper in November 2014.

25

CODE JUD. CONDUCT, Canon 3B(4). Mother claims the trial court's violation of Canon 3B(4) occurred during the attorney ad litem's examination of her:

Q. Have you ever been in jail?

A. No.

Q. And how often do you prostitute?

A. That was only one time.

THE COURT: Well, that's bad luck, huh?

[Mother]: Uh-huh.

Mother avers that the trial court, in making the "Well, that's bad luck" comment, "lacked sensitivity and dignity." She claims that the comment was "insensitive and disrespectful" to her.

Here, from the written record, we are unable to discern the trial court's tone of voice, facial expression, or general demeanor while making the comment. We can review the statement only as it appears in the record. Based on the bare statement, we cannot ascertain whether the comment was said with sarcasm, as Mother intimates, or was said with compassion. Moreover, we note that the comment was made during a bench trial; thus, there was no jury to hear it. Without more, we will not presume that the comment was improper.

Mother also asserts that the trial court violated Canons 5 and 6, which provide:

(5) A judge shall perform judicial duties without bias or prejudice.

26

(6) A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status, and shall not knowingly permit staff, court officials and others subject to the judge's direction and control to do so.

TEX. CODE JUD. CONDUCT, Canons 3B(5), (6).

Mother points to the following exchange, which occurred during the Department's examination of her, to demonstrate that the trial court violated Canons 5 and 6:

Q. And you would agree with me that you still don't have a safe place to live as to today?

A. Okay. I was getting to that.

[The Department's counsel]: Objection. Nonresponse.

[Mother]: Well, can I just -- I do have paperwork.

THE COURT: Shh.

[Mother]: I do have --

[the Department's counsel]: Shh. Listen.

[Mother]: -- paperwork.

THE COURT: Listen.

[Mother]: And I do have --

THE COURT: Ma'am, listen to me.

[Mother]: Y'all not giving me --

27

THE COURT: Ma'am. Listen to me.

[Mother]: Yes, sir. Yes, sir.

THE COURT: Okay? Just --

[Mother]: Yes, sir.

THE COURT: -- answer the --

[Mother]: Yes, sir. Yes, sir. Yes, sir. I just want to show her that I do have --

THE COURT: Shut up.

[Mother]: Oh, help me Jesus.

THE COURT: Just answer her question. Your attorney will --

[Mother]: I'm not --

THE COURT: Listen to me. Your attorney will have an opportunity to ask you questions. That's how this game is placed [sic]. Okay? So, if she asks you if you have a safe and stable place to stay right now, the answer is yes or no.

A. No.

THE COURT: There you go. You can explain by way of your attorney when it's your turn. Okay?

"Texas courts have held that 'the discretion vested in the trial court over the conduct of a trial is great.'" *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240 (Tex. 2001) (quoting *Schroeder v. Brandon*, 172 S.W.2d 488, 491 (Tex. 1943) and citing *Metzger v. Sebek*, 892 S.W.2d 20, 38 (Tex. App.—Houston [1st Dist.] 1994, writ denied)). A trial court is necessarily allowed discretion in expressing itself while

28

controlling the trial of a case. *Draper*, 658 S.W.2d at 209; *see Francis*, 46 S.W.3d at 241. A trial court may properly intervene to maintain control in the courtroom, to expedite the trial, and to prevent what it considers to be a waste of time. *Francis*, 46 S.W.3d at 241.

Here, the record shows that the trial court exercised its broad discretion to maintain control over the proceedings. *See id.* The trial court intervened when Mother continued to speak after the Department's counsel objected to Mother's answer as being unresponsive. The trial court attempted to explain to Mother that her counsel would provide her with an opportunity to expound on her answers during his questioning of her. However, Mother continued to speak over the trial court and to interrupt despite the trial court's repeated requests to Mother to be quiet. Only after the trial court had directed Mother six times to stop speaking did it then tell her to "shut up." Even then, the record shows that Mother continued to talk over the trial court. Given Mother's noncompliance with the trial court's gentler requests to be quiet, we do not agree with Mother that the trial court's conduct was improper or demonstrates any prejudice against her, under the circumstances.

Finally, Mother has not shown that any of the complained-of conduct, on which she relies, likely caused the rendition of an improper judgment. *See Silcott*,

721 S.W.2d at 293; *see also* TEX. R. APP. P. 44.1(a). Nor does our review of the

entire record find any harm based on the conduct. *See Pitt*, 843 S.W.2d at 708.

We overrule Mother's first issue.[5]

## Conclusion

We affirm the judgment of the trial court.

Laura Carter Higley
Justice

Panel consists of Chief Justice Radack and Justices Higley and Massengale.

---

[5] The Department asserts that Mother waived her first issue because she did not object in the trial court to any of the conduct of which she now complains on appeal. "[O]bjection to a trial court's alleged improper conduct or comment must be made when it occurs if a party is to preserve error for appellate review, unless the conduct or comment cannot be rendered harmless by proper instruction." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). Mother does not explain how the complained-of conduct was incurable or why she would be excused from preserving error. *See id.* Nevertheless, we have examined the complained-of conduct in the context of the entire record and conclude that it was neither inappropriate nor harmful under the circumstances of this case.